Case No. 18-1299 et al., Winsor & Redding Care Center, LLC, Petitioner v. National Labor Relations Board. Mr. Manning for the Petitioner, Mr. Hickson for the Respondent. Good morning. Thank you, Your Honors. May it please the Court, John Mannier for the Petitioner, Winsor & Redding. This is a case where the National Labor Relations Board failed to demonstrate, to clearly show, error by an impartial, experienced administrative law judge who specifically found that the employee, unbiased witnesses not employed by Winsor & Redding. Would you argue it would be different if the ALJ was not experienced? Well, the case is taught without experience. That's irrelevant. Universal camera, I'm actually quoting from you. I know, it's still a bizarre notion. You look at the record. I've actually been before this Court on three board cases and he was the ALJ in all of them. So, he's pretty experienced. Has he been sustained in all our cases? I'm sorry? Has he been sustained in all our cases? In any event, it doesn't matter. So, I gather your main point here is that the board, one of your points, is that the board, whatever the merits of its reasoning may be, it was arbitrary to the extent it failed to address the evidence that would show that the employer acted lawfully, which one of the dissenters specifically addressed and addressed the employer's, not primary purpose rule, but, you know, hard and fast rule. And so, that's the first problem, you say? Yes. Yes, I think you can't get past that problem in and of itself. In particular, this ALJ, in addition to finding, based on the credibility of the witnesses, that Ms. Rowland actually engaged in elder abuse and talking about the policy, which again was undisputed, they took it with the utmost seriousness, as dissenting member Emanuel said. Rowland herself admitted that if she had committed the act which the ALJ found she had committed, it would have been grounds for discharge. There was no progressive discipline policy here, unlike many other employers that the board sees, and the ALJ made a specific finding that she would have been terminated, not merely could have been. And so, the board did not address these, the underlying bases for the ALJ's finding that Windsor-Reading had met its burden under the right-line test. And so, there were three pillars of the board's decision. Let me ask you about that. Did you accept to that, because you had the ALJ saying this was particularly telling and was enough for the prima facie showing. Then he goes on to not consider that again as part of the right-line second or third palm, whatever about she would have been fired anyway. But then the board calls it an admission. Right. But thus, what did you accept to, with respect to this conversation about it's all about the union, what did you accept to specifically? We did not file exceptions, so we did not accept the ALJ's findings. Well, of course, you won. Right. But, and then I know in your motion for reconsideration, you said they gave too much weight to it. Yes. Not that they misconstrued it. Well, is that, which is your position in the motion for reconsideration? It's fundamentally that they gave too much weight to it, because, and the big reason we did not file exceptions, and of course, there are strategy reasons for filing and not filing. Right. But just in terms of our position, which has been consistent, is that, again, the impartial experience of ALJ, this was not some rubber stamp of what the company did. This was a long decision by the ALJ, very factually detailed. He deeply discusses the evidence, pro and con. Most of his findings were in our favor. Some, like the finding that Ms. Gillis made this remark, were not in our favor. But what he clearly did was he reviewed the witness credibility. He made very specific and detailed findings on this ground. He also actively questioned the witnesses. This was not some potted plant ALJ. He actively, we point in our briefs to who he questioned. He questioned all the major witnesses, including Ms. Rowland and Ms. Gillis. So we felt that in context, we did not feel that it would be prudent to accept his findings, because, again, we did win, and he did not, I mean, if he had made findings like what the board found, I think that probably would have been a different decision. Do you have any explanation for why the dissent did not discuss this it's all about the union conversation? Well, I think that the dissent was focused on the rebuttal burden. The dissent noted that we had not accepted to the finding. So it pointedly, so it moved on from that. And again, the dissent clearly didn't put the weight on the finding that the majority did. And as we've argued, the evidence does not support the weight that the board put on it. The board, it really reads like an advocacy brief. One of the quotes that in preparing for this argument that really struck us is that the board said that Gillis would not be deterred and went on to talk about the union. And that's just nonsense. I mean, that's not supported by the record. And I would specifically point the court. The nonsense is the idea that Gillis would not be deterred, and that she was basically hell-bent on making sure that she made this discussion about the union. If you look at the testimony of both Angelia Rowland and I think it's Alice Martinez, so those were the two witnesses who the ALJ credited on this point. So you have to take those credibility findings. And it's at pages eight. Well, Gillis was never asked about if she made the comment. Oh, no, she denied it. She said, Well, that's right. She said, not at that point. She said, not at that point. She said she made it later. And interestingly, we could have accepted to this we didn't, but just note for the record that Alice Martinez was at that later meeting. And she said that Gillis made the comment both times, not just at the earlier time. So that's kind of neither here nor there. But I pointed out because, and again, if you look at Appendix A-70-71 for Rowland, A-196-97 and 209-210 for Martinez, you certainly, and again, those are the witnesses the ALJ credited. I defy anybody to come away from reading that credited testimony, adverse to us, and find that Gillis would not be deterred and that she was Well, let me just ask you, though, what I'm not clear about is if you didn't accept to it, all right, the strategy reasons or whatever, but you didn't accept to it, so the board had no opportunity to respond, as it were. So in that record testimony where Mrs. Martinez says Gillis said this twice, all right, and the supervisor says he's concerned about their negotiations, etc., and he doesn't want to get into a fight about that. So the whole union thing is swirling around all of this. So I don't understand why you want to place so much weight on that, because the board, talk about experience, talk about Congress delegating to the board to make these sensitive judgments in this collective bargaining and union management arena. Normally the court wouldn't get into that. Well, normally they wouldn't, and you say I put a lot of weight on it. It wasn't our primary argument. Our primary argument was what you articulated at the beginning, Judge Rogers, which is that I understand. But I'm just saying, why would we fault the board on this second point? Well, I think that you can grant the petition for review without faulting the board. No, I understand that, but I'm just trying to understand. Let's assume that we disagreed with your first point, and now we're on your second point about they put too much weight. You didn't accept what Martinez said, Gillis said it twice, the supervisor said all concerned about the fact that we're in this labor negotiation arena. Well, now, again, though, so Ken Sess, who's the supervisor of the decision maker, he's talking about that in the context of why he went to interview these witnesses after the decision was made. And one thing to note, too, is that it was in the termination meeting where Roland first raises to the company her view that this, at that time it was suspension, but she anticipated it might become a termination. But it was the suspension, she said, was because of her union activity. So now she has planted that flag and raised that as an issue. And Ken Sess has been around enough to know she's high up in the union food chain. This easily could be, and in fact was, made into a case before the board. And so he, at that point, even though he had three days earlier concurred in the termination decision, with no discussion about the union, by the way, there is no evidence that the union was discussed in that decision making conference call late Friday afternoon, May 25th, 2012. Ken Sess makes the decision that, you know, I just need to make certain myself, I mean, he trusted Anguillus, but he wants, he doesn't know these three people. They are not Windsor Redding employees. He's never met them before. He's only able to talk to two of them. But he wants to make sure that he is as credible as Anguillus said they were. He was satisfied that they were. That is the biggest consistency in this case, are those three witnesses. They were unwavering and unimpeached. And so, again, this is plastic right line, where you have the nexus that is found, but the overwhelming evidence proved that not only would the employer have made the same decision in the absence of union activity, but the ALJ went further and found that the weight of the evidence showed that the act of abuse wasn't just alleged, it actually happened. He was that convinced by these witnesses. And so you really have, you know, the board in its appellate briefs says that we have a heightened burden of rebuttal. That's not what it says in the decision. So it just says it's a strong case. It doesn't ascribe to us a heightened burden. But I would submit that we met that heightened burden in spades in this case because of the testimony of those three witnesses. I just don't see how you get past that. And the board really dodges the issue. They drop a footnote and say, well, we don't decide. Why not? They don't explain why they don't. They only say they don't have to. Well, with the sent notes, you don't have to. It's not part of our burden. But it's still a, isn't it obvious that if you've actually proven that the offense actually occurred to the satisfaction of the ALJ, that that's a stronger case than the usual rebuttal case? Right. But what I'm saying is that the reasonable grounds is a lower burden. And we went well above and beyond that. And if you're going to say, even if you think, even if you agree with the board's brief, not it's a decision that you have a heightened burden, well, heightened evidence would logically meet a heightened burden. It would seem to me. And then the other. Let me just ask what I don't understand is why you haven't emphasized the environment that this took place in. Because when I read the conversation of Roland, Martinez, and Gills. And Roland says, why did these people say this? Why did these three people say this? Why, why, why, why, why? And Gill says, you have to understand that when the public hears about nursing homes, when it hears about retirement centers, it automatically thinks there's something wrong. And she says these three outsiders heard what they thought was Roland saying a threat of physical abuse against a resident in a wheelchair. And they're in a public place. They're in a doctor's office, as I understand it. Coming into the doctor's office. I mean, they're not in the nursing home. Right. And then she says, that is why we have to take anything like this so seriously. Not just because substantively we can't have people abusing our residents, but that the outside world is prone to thinking that's what we're doing. And then that leads her into, and every time the public sees something about patient care, for instance, signs on cars that don't say unfair collective bargaining agreement, but instead says substandard patient care, whatever the sign said. That's what led her into saying, just like we can't have any allegation like this made in public with outsiders, without acting as strongly as we can, when you all put these signs, she should have never done it, when you all put these signs on the cars, that does the same thing. And that's when Martina says, this isn't about the union, this is about your job. And she said, it is about, I mean, Gil says it is about the union. That part is, the signs on the cars. I have some critique of our brief, as you just raised. It's in there, but it's not, you laid it out better than I did. I'll give you credit for that for sure. But it is in there, and again, the testimony that I cited to you, especially appendix page A70, that is Roland's testimony. And it completely corroborates what you just described. That's the testimony of both Roland and Gillis about this conversation. And, you know, I think even the ALJ didn't fully grasp it. I think that might be one reason why I didn't go into it as much. When you said Gillis, Gillis denied it happened, you mean Martina's. Gillis denied saying it was all about the union. That's the one, that's really the discrepancy, is whether she made that comment. And she said she didn't. And she also. I thought she said I didn't talk about the signs until, not at that point. She did, but there was also, but they were talking, but I think what she acknowledged was that she was talking about the public perception of nursing homes. Yeah. It was not so much about the signs. It was Roland's credited testimony where the signs came into that context. And you're right, that is the context in which it was made. And by the way, this isn't something that was briefed, but it's not at all clear that a sign accusing Windsor Redding of bad patient care would actually be protected activity. Obviously, signs saying that they needed a union contract, that's quintessential protected activity. The signs said both. The thing that's perplexing, I guess, is why even go off on this tangent? Because under right line, the employer can win even if the employer is guilty of union animus. Well, I mean, that's the whole point of right line, whether you would have discharged in any of that. And why wouldn't you just focus on the fact we showed that she did what she was accused of. The ALJ agreed. That's not discredited. There's no progressive discipline. And the woman herself agrees she should have been fired if she was guilty. That's the end of the discussion under right line, if you're right. Right. Well, and again, I mean, I'm not understanding why we're off on this tangent. It doesn't matter. It's like an employee goes up and punches the daylights out of a supervisor. And there's no question about it. Everybody witnesses it. And everyone knows the supervisor hates unions. Is the employer going to lose? Of course not. And we, yes, I think, so first of all, I think it was our last argument in the brief. So it wasn't our primary. We had three other arguments in the brief. Okay. Okay. Good. Because the other things were that, you know, the board tried to make a disparate treatment argument. I, another thing that I wish I had articulated better in the brief, but it's in the record and portions of the record that we cite in the brief. The board accused Windsor Redding of not discussing the, really the differences between Nancy Atkinson and Angelia Rowland. And if you look specifically at the appendix, page A461, maybe you need to read, we cited A458 to 462, so maybe you want to read the whole thing in context. And that's where Ms. Gillis is testifying about Ms. Atkinson. And that's the only testimony in the record, by the way, about Atkinson. Everything else is just cold hard paper. And you have I'm sorry? The difference was they never found she had actually, Atkinson had ever done what was alleged. They had not found that she had abused the patient. So what they actually did, so the patient in Atkinson's versions of the event were actually not contradictory. So the resident, from her standpoint, she's complaining, it's basically, I would describe it as unprofessionalism and perhaps negligence. Because this is someone who is very sensitive to the touch. And Atkinson is touching her as gently as she feels she can, nevertheless is causing apparently extreme pain to the resident who complains about it and also complains that she made some very unprofessional comments. And what the write-up that the record suggests shows is that she was given a written warning, really it was for the unprofessionalism. You're not supposed to roll your eyes and you're not supposed to get all upset. And Gillis goes into how this employee, who later, by the way, was terminated, according to the record. What about Mr. Rich? Well, Mr. Rich, that disproves disparate treatment. And I honestly am at a loss to how the board completely fails to discuss this. The ALJ sure did. And that, to me, that's a shining example of how there is no disparate treatment. You have basically an anonymous whistleblower in that case who, you know, all respect to whistleblowers, but they never knew this person's identity. Because this whistleblower, he or she only spoke to the state. So that, the Rich situation didn't even proceed to the same channels as Rowland. In Rowland, the complaint was made by the doctor's employees to Windsor Redding. Windsor Redding's management then made the report to the state as a mandatory report. In the Rich case, an anonymous whistleblower made a report directly to the state. That is how Windsor Redding found out about it. And they never know, and to this day do not know who said that. And then the other thing, the other thing that we highlighted is the post-discharge investigation that they said passed out. And, you know, as a legal writer, if you're, if the big case that you're relying on, you only refer to with a CF site, that's a sign of weakness in your argument. It's not necessarily. It's a sign that this hasn't come up before in this particular way. But it's their only argument. And they're relying, they're putting all their eggs in the Lowry trucking basket. And Lowry trucking was such a different case from this one. And the board just is resistant to acknowledging this. The dissent explained it. And it's also a point that neither the general counsel nor the union raised. And the board is technically free to raise these. But again, we're talking about, well, in a situation where they came up with it on their own, and it's so unpersuasive at best, and then they try to ascribe doubt to Ann Gillis, not just before she interviews the witnesses, but even after the decision has been made. Yeah, but remember, there's a lot of evidence that you haven't talked about here. Right. So I realize that I'm well over my time. I would like to have some rebuttal time. Thank you so much, Your Honors. All right. Mr. Hickson. Good morning. May it please the court. Michael Hickson for the NLRB. The board recently found that the company unlawfully suspended and discharged its longtime employee, Angela Roland, because of her extensive union activity. Making that finding, the board carefully applied the right line analytical framework to the particular record and the unusual facts before it. Your Honor, I don't, I don't know what, I feel that the board did address the arguments made by the dissenting member in its opinion by disagreeing with them. And the board majority is, of course. Your Honor, I can maybe answer your question better if I had better understood the specific point at issue. Do you mean with respect to the finding that the witnesses, all of the things we're talking about in terms of the finding that the abuse or the evidence that supported a finding that the employer acted lawfully, didn't the board have to engage in that, particularly given the dissent? Yes, Your Honor. And I think that the board did. I think that in explaining the basis for its decision, Your Honors, primarily it seems that the point that's being the most discussed is the finding about that the abusive conduct was found to have occurred by the judge. But under this court's precedent, for example, the Fort Dearborn case, it's well established that right line is not about what actually happened. It's about an employer's adverse actions, what motivated those actions. So it goes, it's about employer motive. And the court was clear in Fort Dearborn, in Inova Health, and other cases that assessing an employer's affirmative defense under right line does not concern what the employee actually did, whether the employee actually engaged in the misconduct. It assesses the employer's proof, its burden to prove what it actually and reasonably believed, whether it acted on those beliefs, and whether it demonstrated through record evidence that it would have taken the same actions, even in the absence of the union activity. The fact that these three staff persons for the doctor's office, who are not company agents, who do not work for the company, who are no part of the decision-making process in the adverse actions, the fact that those people actually genuinely believed that the misconduct occurred, not only does it not establish the employer's burden, it does not establish that the employer actually believed. And as the board found, its actions and the testimony of its managers demonstrate that it did not believe that the misconduct had occurred. Rather, that it continued to harbor significant doubt. Because of this post-discharge investigation? Because of the post-discharge investigation primarily, and as further illuminated by its manager's testimony, the testimony of, I guess I've learned now it's Ms. Gillis, I've been mispronouncing it in my head, Ms. Gillis and Mr. Sess, showing a consistent thread, particularly with Ms. Gillis because she was more involved in the earlier stages, a consistent thread through her testimony that from the time the accusation was reported to her, through the 26, 28, 30 hours or so that led to the investigation and then the discharge decision, and then through the carrying out of the discharge decision on the next business day after the long weekend, that Ms. Gillis was skeptical. And as you said, the record well demonstrates... that everyone agreed, including that employee, you will lose the job if you're guilty. And so management acted very responsibly in saying, we really need to check this out every which way. We don't want to do this whimsically. It seems to me that it proves just the opposite of what you're saying. They're being totally responsible. They said, we've got to check this out. This is a really good employee. He's been here a long time. But we all agree because of what's at stake, if she did it, she's gone. And the employee agreed, if I did it, I'm gone. Your Honor, I'd like to try to make a couple points in responding, if I may. First, the employee's testimony, a non-attorney employee's subjective opinion that if she had engaged in the conduct, it would have been appropriate, which is the question she was asked. Would it have been appropriate for you to have been terminated? That is not evidence that the employer would have terminated her. It's the employer's burden. It's not, you know, the employee's subjective opinion that it would have been appropriate is not evidence establishing that the employer would have taken that action, even in the absence of her union activity and notwithstanding the remarkably strong evidence demonstrating the unlawful motive in its adverse actions. And I guess if I could further respond, Your Honor, I guess the point that you're making or the interpretation that you're offering about the employer's investigation, I could see that argument holding much more weight if it was not a continued post-discharge investigation. Why? Why? Believe it or not, there are some employers who really feel responsible and they take what they're doing seriously and they want to pursue it. They can still have more than enough case at the moment the discharge is announced and then go on to say, let's look at this further. Why is that damn them to say, let's look at it further? Just let's check everything again. Why is that bad? I wish we did that in society more often. Well, Your Honor, it's not a question of good or bad. It's a question of what it does. It doesn't damn you because you say, I want to make doubly sure. I want to check it three, four times every which way I can to make sure what we did was right. I understand. A couple of points. First, Your Honor. That seemed to me the silliest part of the board's discussion, that the employer gets damned because the employer double, triple checked after the fact. The question is whether or not the employer at the moment of discharge did something the employer otherwise would have done. That's right, Your Honor. And the board reasonably found that the totality of the evidence, including the admitted post-discharge investigatory actions and the testimony of Sess and Gillis about those actions showed it wouldn't have. I mean, it showed that on this record, the evidence substantially supports. There was nothing in the post-discharge action done by the employer suggesting that if we confirm that she's guilty, we may or may not discharge her. They weren't hesitant on that. If they confirmed again and again and again that she was guilty of what she was accused of, the employer didn't doubt for a minute she was done. Well, Your Honor. That was the whole point. That's why they went out of their way to try and confirm to make sure again. But that doesn't mean they were wrong when they did it at the moment of the original discharge. Well, but, Your Honor, it's a question not of whether they were right or wrong of what actually happened, but of what it reveals about the employer's belief. And the board reasonably found, I understand the alternative interpretation Your Honor is offering, but respectfully, the fact that there's an alternative interpretation is not a reason for the court to displace the board. I don't think the board's reasoning can stand up to scrutiny that we require. Reasoned decision-making is what we look for. It doesn't look like reasoned decision-making to me. Your Honor, I guess maybe if I highlight some of the testimony that I feel demonstrates that the significant doubt continued beyond the collection of the statements from the employee, from the doctor's office witnesses. For example, at appendix page 430, Ms. Gillis testified that on May 29th when the employers were discussing Ms. Rowland's circumstances and what to do, she testified that they discussed how can we in any way get around this. That evidence is doubt. On May 29th, appendix page 439, Ms. Gillis admitted that after having already discharged Ms. Rowland, she asked Ms. Rowland, where was the van driver? According to Ms. Gillis, just to be clear in my mind, she's seeking additional clarity about the events of May 24th because she continues to doubt that Ms. Rowland did this. No, because she wants to give her the benefit of the doubt. I just don't understand how that can be. And there's evidence that the resident who was supposedly verbally abused, her daughter, her husband, both said, we don't believe this happened. I mean, when you've got a patient whose own family says, we think so much of Ms. Rowland, we don't think this happened, of course you're going to say, I've got to talk to everybody I can think of, because even, I think, Gillis, I don't know if this is in her testimony, but the impression you get reading it is everybody was astounded that this happened. And the resident herself mimics people, has different voices, and the three witnesses, the only thing was we heard two distinct voices rather than one voice, I mean, one sentence in one voice and one sentence in another voice. I think it shows their good faith in trying to make sure that when they fired Ms. Rowland, they were not acting unfairly to her. Well, Your Honor, Their hands were tied. This evidence shows that there was a reasonable basis for the employer to have believed that Ms. Rowland did it at the time they carried out the discharge. There was also a reasonable basis, some of the evidence that Your Honor and Your Honors on the panel have made reference to, there was also a reasonable basis for the employer to have been quite skeptical and doubtful that Ms. Rowland did it. And what does the evidence show about which path the employer, this employer, on this record actually took? The board reasonably found that the path they took was that they doubted. They continued to doubt. And I guess I'd like to add, too, that Ms. Rowland is on suspension. She's suspended. She's at home. She's not interacting with residents. She's not coming to the facility. So what is the employer's rush? What is the explanation for the employer's rush to carry out this discharge when she is not there, when they continue to harbor doubt that she did it, and they harbor so much doubt that they determine we need to keep investigating whether she did it, even though we've already fired her? I'll tell you one reason for the rush, and it's not in the record, and that is this happened in public. And those three ladies, we don't know that there weren't patients in the room. We don't know that those three women didn't say, you won't believe what happened in our office this morning. And the whole point of Gil is saying everything we do in a nursing home, once the public hears about it, we always get the bad interpretation, or they always believe we're here abusing these vulnerable people. That's one reason to continue to try to tie it down, even if she was at home, not anywhere near the nursing home. Well, I guess, Your Honor, first I'd just point out, of course, that the employer hasn't made that kind of argument. But additionally, I can see that as a reason to further investigate to tie it down, but not as a reason to pull the trigger on discharging this 11-and-a-half-year employee who, it's undisputed, before this event had always had a beyond exemplary record, had never once been accused of any inappropriate conduct toward a resident. Why pull the trigger before you complete that investigation? Some of the additional evidence, for example, on appendix pages 436, 439, 442 to 445, Ms. Giles testified that she reached out to Mr. Johnson, that's the van driver, that she reached out to the van driver's dispatcher on May 30th, after the discharge, to make sure that I understood, or to make sure that I'm clear in my mind about the events of May 24th. And specifically, she sought to probe whether any threat that Mr. Johnson may have heard may have been made by the resident, rather than Ms. Rowland. Additionally, at appendix page 447, Ms. Giles testified, describing her general post-discharge distress about the whole situation, that she was very distressed to have discharged Ms. Rowland. And she specifically highlighted, in explaining that distress, her own ultimate failure to dissuade the doctor's office staff persons from claiming that that voice that they heard make that threat was Ms. Rowland, as opposed to resident B. A failure to dissuade conveys, clearly, a feeling that it was not Ms. Rowland. She was trying to dissuade them because she did not believe that it was Ms. Rowland. And she articulates that in her own words, in describing why she continued to be very distressed about the discharge, after having already carried out the discharge. I mean, it's undisputed, the judge even found, this is appendix page 1178, it's undisputed that the reason for the post-discharge investigation, in the words of the judge, for example, was to continue the investigation of whether she had actually threatened and yelled at resident B. I mean, that's why they're doing this. They're continuing to examine and to scrutinize whether she did it. Mr. Sess testified, at appendix page 608 to 610, that his role in this post-discharge investigation was to check or establish the, quote, veracity of the claims made by the doctor's office staff persons, and to, quote, find out if they were credible. Your Honors, I don't have much time on my clock. I wondered if I could quickly talk about disparate treatment? If I could talk about disparate treatment briefly? Well, just briefly, yeah. Okay. Well, I guess that just briefly, I think I heard some discussion regarding primarily Nancy Antonsen. I mean, the Board, we respectfully submit to the Court that the Board's finding of disparate treatment is supported by the record and further supports its finding that the company failed in its burden. But regarding Ms. Antonsen specifically, I believe there was discussion about whether the, that the employer did not believe that she had done the misconduct, or at least the physical misconduct. And I would submit to you that it's, that that notion is not supported by the record. The company, the documentary evidence sets forth Ms. Antonsen's conduct, her explanations for that conduct, and then what the employer did. So the company heard all of Ms. Antonsen's innocent, you know, protestations or attempts to explain what happened. And yet the company both disciplined her for the conduct based on the report of the resident, and furthermore, reported her conduct to the State of California, again, based on the account of the resident, and in both the discipline and in the report to the State of suspected abuse, that the company suspected abuse. The company listed not only the eye roll and the verbal statement, but also listed in both of those documents that Ms. Antonsen handled the resident in a rough manner, and that she, despite the resident's request that she be more gentle, that she continued to handle her in a rough manner. If there are any more questions, I'm more than happy to answer any of them. Otherwise, I respectfully request that the Court enforce the Board's order in full. Thank you. All right. Do you have any questions? I think we have your argument. Oh, you don't want to ask me? Yeah. Okay. I'll defer. Thank you so much, Your Honors. Okay.
judges: Henderson, Rogers, Edwards